1  Ronald Yandell / V-27927

2  CSP / SAC

3  P.O. Box 290066

4  Represa, Ca. 95671

5

FILED

AUG 19 2024

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

6          In The United States District Court

7        For The Eastern District OF California

8

9  Ronald Yandell                    Case No. 2:24-CV-2240  AC (PC)
        Plaintiff

10

11      V.                           First Complaint

12  1) D.E.A. Special Agent           Demand For Jury Trial
      Brian Neuring

13  2) Correctional Officer
      Cory Perryman

14

15

16            Complaint

17            Introduction

18    1) Plaintiff Ronald Yandell is A Federal

19  detainee currently incarcerated in the

20  custody of the California Department OF

21  Correctionsand Rehabilitation (CDCR) At

22  California State Prison Sacramento.

23    2) Plaintiff was indicted in the Eastern

24  District Court June OF 2019 FOR Racket-

25  eering.

26    3) Plaintiff is challenging transcripts and

27  documents authored by Defendant C/O Cory

28  Perryman that violate Plaintiff's due

process right and right from retaliation.

4) Plaintiff is also challenging an email discovered through government disclosure on April, 2024 from Defendant Brian Nething to AUSA Jason Hitt expressing his personal desire to "crush" Plaintiff for his prison reform activity by leading hunger strikes at Pelican Bay SHU, thus violating Plaintiff's First Amendment right to peacefully protest

5) Plaintiff is also challenging an affidavit authored by Defendant Brian Nething falsely claiming several individuals were trafficking drugs for Plaintiff violating Plaintiff's right to due process.

## Jurisdiction

6) This cause of action arises under the United States Constitution, enforceable pursuant to 42 U.S.C. §1983. Jurisdiction is pursuant to 28 U.S.C. §§2201, 2202.

## Venue

7) Venue is proper under 28 U.S.C. §1391 (b)(2), because the events and omissions give rise to the claims occurring in this district.

## Parties

8) Plaintiff Ronald Yandell is a Federal detainee incarcerated in the Custody of the (CDCR) at (CSP/SAC).

9) Defendant Brian Nehring who is a Special Agent of the Drug Enforcement Administration of the United States. He was lead investigator on Federal Complaint author of Email and author of Wiretap Affidavit. Being the Agent in charge defendant Nehring is responsible for the acts complained of herein. He is sued in his official capacity and in his individual capacity for damages.

10) Defendant C/O Cory Perryman was the (CDCR) Gang Investigator who gave interview, authored Transcripts, reports and gave testimony at February 13, 2024 "Evidentiary Hearing. Defendant Perryman is responsible for the acts complained of herein. He is in his official capacity and his individual capacity for damages.

## Statement Of Facts

11) Plaintiff Yandell incorporates all the facts previously and furthers avers as follows:

12) In 2011 and 2013 Plaintiff was housed

1    at PELICAN BAY STATE PRISON, (P.B.S.P.) SECURITY

2    HOUSING UNIT (SHU)

3       13) PLAINTIFF, ALONG WITH OTHER SIMILAR

4    SITUATED PRISONERS DECIDED TO PROTEST THEIR

5    CONDITIONS THROUGH HUNGER STRIKES. SEE:

6    EXHIBIT A, DECLARATION OF LAW PROFESSOR

7    KERAMENT REITER, pg. 2 (9.)

8       14) THE PROTEST WAS ULTIMATELY SUCCESS-

9    FUL. SEE: ASHKER v. BROWN, CASE NO. 4:09-

10    CV-05796-CW (N.D. CAL, OAKLAND DIV.)

11       15) PLAINTIFF WAS ALSO CO-AUTHOR OF "THE

12    END OF HOSTILITIES" MANIFEST BETWEEN THE

13    RACES. SEE: EXHIBIT A. pg. 2 (9.)

14       16) PLAINTIFF WAS SUBSEQUENTLY TRANSF-

15    ERRED TO (CSP/SAC) IN APRIL 2015.

16       17) UPON RELEASE TO GENERAL POPULA-

17    TION IN OR ABOUT OCTOBER 2015 THE PRISONERS

18    HELD ELECTION FOR MAC REPRESENTATIVES.

19    PLAINTIFF WAS ELECTED MAC PRESIDENT.

20       18) IN OR ABOUT AUGUST PRISONER BRANT

21    DANIEL WAS ACCUSED OF MURDER IN SALINAS

22    VALLEY STATE PRISON. SEE: EXHIBIT B, DECL

23    ARATION OF BRANT DANIEL.

24       19) BRANT DANIEL WAS REPEATEDLY TOLD

25    by CORRECTIONAL OFFICERS AND DEBRIEFING

26    INFORMANTS THAT WHAT HE DID WAS A COWARDLY

27    ACT, THAT HE OWED A LOT OF MONEY FOR drugs

28    AND WAS TARGETTED FOR MURDER OVER HIS

1  Actions. See: Exhibit B

2     20) Those rumors persisted throughout

3  2016, 2017 and 2018, but those in General

4  population did not know the source.

5     21) In late 2018 there was rumors that

6  the Whites and so-called Bulldogs fought

7  one another in two separate prisons.

8     22) Due to these altercations (CDCR)

9  officials set out to speak with 20 or so

10 prisoners. 6 were alleged A.B. members.

11 See: Exhibit C - Evidentiary Hearing trans-

12 cripts pg. 47 Line 24

13    23) Defendant Perryman came to (CSP-

14 Sac) to speak with Plaintiff in his MAC

15 Representative position.

16    24) Plaintiff denied any prior knowledge

17 of problems or ever even knowing or

18 ever meeting someone who claimed to

19 be a so-called Bulldog.

20    25) Defendant Perryman then brought

21 up Brant Daniel commenting that what

22 he did was a cowardly act, owed a

23 large debt for drugs and that he was

24 targetted for murder over his actions.

25    26) Plaintiff assured Defendant

26 Perryman that there was no split as

27 he was trying to push or any problems.

28    27) Defendant Perryman later thought

1  authored transcripts and reports that
2  Plaintiff stated what Daniel did was a
3  cowardly act, owed a large drug debt
4  and that He Had safety concerns.
5   28) Completely Fabricated information
6  that Defendant Perryman knew was
7  coming From debriefers out of Salinas
8  Valley state Prison but yet attributted
9  it to Plaintiff.
10   29) This is why my Attorneys requested
11  defendant Perryman testify at Evidentiary
12  Hearing. See: Exhibit C
13   30) Defendant Perryman admitted at
14  the Hearing Plaintiff NEVER mentioned
15  Daniel's Name. See: Exhibit C pg. 55
16   31) At Hearing Defendant Perryman
17  stated Plaintiff spoke in guarded Lang-
18  uage. See: Exhibit C pg 67
19   32) The Fact is (CDCR) officials routinely
20  take Prisoners words and put in their
21  own. See: Exhibit C pg 58
22   33) Defendant Perryman admitted that
23  prior to the statewide Bulldog interviews
24  they had received a lot of intel re: the
25  Bulldog Fights and Daniel incident. See:
26  Exhibit C pg. 70 lines 15,16,17,18,19,20 and 21.
27   34) That information was discovered
28  in Brant Daniel's confidential C-File.

35) Four debriefers out of Salinas Valley State Prison in 2016 claiming what Daniel did was a cowardly act, owed a large drug debt and was marked for murder.

36) (CDCR) officials, including defendant Perryman weren't trying to find the truth. Their agenda was to push the debriefers narrative, attribute it to plaintiff putting his life in danger, Daniel's life in danger and anyone who fell for their agenda. See: Exhibit A pg. 2 and (CDCR's) retaliation against plaintiff and all hunger strike reps.

37) In (CDCR's) desire to retaliate against plaintiff they contracted D.E.A. Special Agent Brian Nehring

38) Defendant Nehring was the lead investigator, author of federal complaint and author of Title III wiretap affidavit. See: Exhibit D - wiretap affidavit.

39) In the complaint and wiretap affidavits defendant Nehring made multiple false allegations under penalty of perjury.

40) In April 2024 the government disclosed an email defendant Nehring sent to AUSA Jason Hitt. See: Exhibit E

41) In this email defendant Nehring expresses his desire that he wants to

1. "CRUSH" PLAINTIFF SO BAD IT MADE HIS TEETH
2. HURT.
3.    42) THE EMAIL CLEARLY SHOWS DEFENDANT
4. NEHRING IS ANGRY AT PLAINTIFF FOR HIS
5. PARTICIPATION IN THE HUNGER STRIKES. A
6. FIRST AMENDMENT PROTECTED RIGHT.
7.    43) IN THE EMAIL DEFENDANT NEHRING
8. FALSELY CLAIMS NUMBERS EXTRACTED
9. FROM PLAINTIFF'S CONFISCATED CELL PHONE
10. BELONG TO LARGE DRUG DEALERS OUT OF
11. ARIZONA AND CHICAGO.
12.    44) CELL PHONE EXPERT'S INVESTIGATION
13. LATER REVEALED THE TWO NUMBERS WERE
14. AT&T CALL CENTERS.
15.    45) IT'S ALSO IMPORTANT TO POINT OUT
16. THE EMAIL WAS CREATED AND SENT FEB.
17. 2016 BUT WASN'T REVEALED FOR 8 YEARS.
18.    46) IN DEFENDANT NEHRING'S WIRETAP
19. AFFIDAVIT HE MADE MULTIPLE FALSE ALLE-
20. GATIONS. #1. THAT PLAINTIFF HAD A FEDERAL
21. CONVICTION FOR CONSPIRACY TO MANUFACTURE
22. METHAMPHETAMINE. NOT TRUE. EXHIBIT D pg. 16
23.    #2. THAT PLAINTIFF DIRECTED DRUG
24. RELATED MURDERS IN CONTRA COSTA COUNTY AND
25. SOLANO COUNTY. NOT TRUE. EXHIBIT D. pg. 16
26.    #3. THAT PLAINTIFF'S WIFE RENA RICE
27. WAS INVOLVED IN A.B. BUSINESS THROUGHOUT THE
28. 90's. NOT TRUE. EXHIBIT D. pg. 55

1                 Second Claim

2        First Amendment Violation: Due Process

3 Defendant Brian Nehring violated Plaintiff's

4 rights under the First Amendment to the U.S.

5 Constitution to due Process.

6

7 Supporting Facts: The above defendant Violated

8 Plaintiff's Due Process Rights For Retaliation

9 over leading Hunger Strikes At C.P.B.S.P.) SHU

10 And Making Numerous False Statements

11 Against Plaintiff.

12

13 Injury: Potential Harm Consistent with U.S.

14 Law.

15

16          Memorandum Of Law

17            Points And Authorities

18

19             First Claim

20      There is Limited due Process rights to

21 Have erroneous and derogatory information

22 expunged From a Prisoner's institutional

23 File. See: Paine v. Baker, 595 F.2d 197, 201

24 (4th Cir. 1979); Accord, Farinaro v. Coughlin,

25 642 F. Supp. 276, 281-82 (S.D.N.Y. 1986).

26      Plaintiff can request expungement From

27 records of "Security threat" Label insofar

28 as it was based on an incident which involved

1. retaliatory actions by officials. The "evi-
2. dentiary hearing" in plaintiff's criminal
3. case is very important. Defendant Perryman's
4. actions and admissions at the February 9th
5. hearing violated plaintiff's First Amendment
6. due process rights. See: Exhibit C - evi-
7. dentiary hearing transcripts. Defendant
8. Perryman works for (CDCR) in the office
9. of correctional safety as a special agent.
10. Defendant Perryman testified at hearing
11. concerning (CDCR) policy in debriefing
12. gang members. pg. 27 Defendant admitted
13. that if debriefers contradict each other
14. or certain things it's left out of reports.
15. pg. 28 Defendant admitted (CDCR) policy is
16. to corroborate information, not disprove it.
17. pg. 33 Defendant admitted it's not (CDCR) policy
18. to investigate reliability. pg. 44 Defendant
19. admitted there's no designated section in
20. a debriefer report for people who dis-
21. agree with any particular information
22. provided by any debriefer. pg. 62 Defend-
23. ant admitted when he writes debriefer
24. reports he puts most in his own words. pg.
25. 64 Defendant admitted when he writes up
26. debriefer report he summarizes what the
27. debriefer said.
28.     February 13th hearing. Defendant

1   Perryman testified that in 2018 the Office
2   of Correctional Safety was tasked with
3   going out to several prisons and speaking
4   with who they had identified as Highly
5   influential A.B. members due to White
6   inmates getting involved in a Mexican
7   Mafia, or Southern Hispanic and Fresno
8   Bulldog incidents. pg. 46. They spoke to
9   20 individuals with 6 being alleged A.B.
10   Defendant Perryman asked Plaintiff how the
11   A.B. would benefit getting involved. Plaintiff
12   did not answer the question but later
13   transcripts and reports claimed Plaintiff
14   said it didn't benefit us. At the hearing
15   defendant Perryman admitted though Plaintiff
16   didn't say those exact words. It's just more
17   of their own terminology. Defendant also
18   brought up Brant Daniel saying what
19   Daniel did at Salinas Valley was a cowardly
20   act, owed a large drug debt and was marked
21   for death over his actions. pg. 54. Again
22   Defendant later attributes those statements
23   to Plaintiff. Truth is Plaintiff brought up no
24   names or nicknames. pg. 55. This is what
25   Plaintiff is challenging. Defendant Perryman
26   was not trying to find the truth. What he
27   was doing was playing the devil's advocate
28   by pushing debriefer information to dis-

1  credit Daniel, Plaintiff and all Hunger
2  Strike Representatives. In 2016, 2017
3  and 2018 Daniel Himself was Hearing
4  the same accusations from (CDCR) officials
5  and informants. See: Exhibit B - Declara-
6  tion of Brant Daniel. Then in 2023
7  Daniel received parts of His Confidential
8  File with Four debriefers who were the
9  original authors of the Cowardly Act
10  remarks and owing a large drug debt.
11  Information Defendant Perryman was
12  surly privvy too. A dangerous game in-
13  deed putting everyone's life in yeapordy.
14  It's also necessary to point out it that's
15  not treacherous enough in 2016 Daniel
16  tried to send Plaintiff correspondence
17  trying to explain what actually Happened
18  to Him but it was intercepted by (CDCR)
19  Officials and wasn't revealed until 2019.
20  This was all done in Retaliation as ex-
21  plained by Law Professor Keramet Reiter.
22  See: Exhibit A. pg. 3, ll. and pg. 4, b.
23        All information regarding Daniel
24  should be expunged from Plaintiffs records.
25  See: Gaston v. Coughlin, 81 F. supp. 2d 381,
26  39 e (N.D.N.Y. 1999) (directing expungement of
27  Prison Files of trumped up charges. Also see:
28  Thor v. Superior Court, 5 CAL 4th 725, 732, 855

(1993) (EN bANK) (Right of self-determination or the

1  of medical treatment of any form iRRE-

2  spective of the personal consequences"

3  and this right is enjoyed by PRISONERS

4  unless the officials demonstrate a

5  threat to institutional security.

6

7           Second Claim

8        Defendant Brian Nehring violated

9  Plaintiff's due process rights. He connected

10  his persecution of Plaintiff to his prison

11  Reform Advocacy. see: Exhibit E - Email

12  sent from defendant to AUSA Jason Hitt. He

13  told Hitt he ran an internet search of

14  Plaintiff, Found out Plaintiff Lead Pelican

15  Bay SHU Hunger strikes and stated he wanted

16  to "CRUSH" Plaintiff so bad it made his teeth

17  Hurt. Even the court must agree this is a

18  very disturbing comment from a special

19  agent from the DEA. Plaintiff's Right to

20  Hunger strike at (P.B.S.P.) SHU - is protected

21  First Amendment conduct. see: Johnson v.

22  Ryan, 55 F.4th 1167, 1201 (9th Cir. 2022) ('The

23  most Fundamental of the constitutional

24  protections that Prisoners Retain are the

25  First Amendment Rights to File grievances

26  and to pursue civil Rights Litigation in

27  the courts, (quoting Entler v. Gregoire, 872

28  F.3d 1031, 1039 (9th Cir. 2017).

1    DEFENDANT NETTING in His desire to
2    "CRUSH" Plaintiff claimed two phone numbers
3    extracted from a confiscated cellphone out
4    of plaintiffs cell belonged to large drug
5    dealers out of Arizona and Chicago. See:
6    Exhibit E. The truth is a cellphone expert
7    for plaintiff later determined the two
8    numbers were AT&T call centers who
9    plaintiff contacted to activate cellphone.
10        Futthermore in DEFENDANT's motive to
11   punish plaintiff He Filed a Wiretap Affidavit
12   Full of False statements that were never proven.
13   See: Exhibit D - Wiretap Affidavit.
14        #1) DEFENDANT FALSELY claimed plaintiff
15   Had a Federal conviction For conspiracy to
16   manufacture Methamphetamine. EXH. D pg. 16
17        #2) DEFENDANT FALSELY claimed plaintiff
18   directed drug related murders in Contra Costa
19   County and Solano County. EXH. D pg. 16
20        #3) DEFENDANT FALSELY claimed plaintiffs
21   wife Rena Rice was involved in A.B. business
22   throughout the 90's when I didn't even know
23   Rena Rice until 2009. EXH. D pg. 55
24        #4) DEFENDANT FALSELY claimed plaintiff
25   was taxing drug dealers after being released
26   From Federal Prison. EXH. D pg. 56
27        #5) DEFENDANT FALSELY claimed Brian
28   Butler, Roger Sunderland, Joel Bert Killingsworth,

1. Rodney Short and Michael Quesenbury were
2. selling drugs for Plaintiff. Exh. D pg. 15
3. All gave declarations that they never met
4. or spoke to Plaintiff. Exh. D. pg. 119, 120.
5.     Plaintiff has no standing to challenge
6. wiretap application but under the U.S.
7. Constitution Plaintiff is still protected from
8. Malicious Acts and Motives. See: United States
9. v. Grover, 571 F.2d 450, 453 (9th Cir. 1978).
10.     At the very least, Defendant Nehring's
11. "Crush" Him statement gives the "mere appearance"
12. that His sole motive was designed to punish
13. Plaintiff for leading the Hunger Strikes at
14. Pelican Bay SHU. See: Jenkins, 504 F.3d at
15. 699 And such an expressed motive is likely
16. to chill the exercise of legal rights by
17. other Prisoners who must make their choices
18. under similar circumstances in the future.
19. (quoting DeMarco, 550 F.2d at 1227)
20. 
21.       Exhaustion of Remedies
22.     Plaintiff was informed by Prison
23. Litigation He could not challenge issues
24. they had no jurisdiction over.
25. 
26.       Prayer for Relief
27.     Wherefore, the Plaintiff prays that this
28. Honorable Court grant the following relief:

A) Declare that the acts and omissions of the defendants violated plaintiff's constitutional rights and FEDERAL LAW;

B) Enter an injunction requiring the defendants, their agents, subordinates, employees and all others acting in concert with them to cease their unconstitutional and unlawful practices and to remedy their violations of the Constitution and the laws;

C) Enter an injunction requiring defendants to restore to plaintiff all rights and privileges he enjoyed prior to the retaliation;

D) Allow plaintiff to return to general population.

E) Award the plaintiff nominal, compensation and punitive damages;

F) Award to the plaintiff reasonable costs and attorney fees; and

G) Grant the plaintiff such other relief as the court may deem just and proper.

Respectfully submitted, this the 1st of August 2024                    Ronald Vandell / V-27927

                              Ronald Vandell

Exhibit A

## Declaration of Keramet Reiter in *U.S. v. Yandell*

I, Keramet Reiter, declare the following:

### I.   Expert Qualifications and Compensation

1. I am a Professor in the Department of Criminology, Law & Society at the University of California, Irvine. My academic specializations are in punishment and prisons. I teach undergraduate, graduate, and law courses about prisons, punishment, post-conviction law, legal history, and the use of social science evidence in law. I received a B.A. in Social Studies from Harvard University; an M.A. in Criminal Justice from the City University of New York, John Jay College of Criminal Justice; and a J.D. and Ph.D. in Jurisprudence and Social Policy from the University of California, Berkeley. I have received national recognition and awards for my research and served as the Principal Investigator on research projects funded by multiple private foundations and public agencies, including the Bureau of Justice Assistance and the National Science Foundation.

2. I have published two sole-authored books: *23/7: Pelican Bay Prison and the Rise of Long-Term Solitary Confinement* (Yale University Press, 2016) and *Mass Incarceration* (Oxford University Press, 2017). And I have published dozens of law review articles, peer reviewed articles in social science and public health journals, and book chapters focused on the institutional and legal history of mass incarceration and the impacts of mass incarceration policies on individuals in the United States and in Europe. Much of my work specifically analyzes the history of institutional policies and evolution of practices governing placement in segregation, solitary confinement, and restrictive housing, as well as the lived experience and psychological and physical effects of placement in highly restrictive conditions of confinement. In my work, I have interviewed hundreds of prison staff, prisoners, and former prisoners in the United States and Europe, with a particular focus on practices in and experiences of various restrictive forms of confinement, especially long-term solitary confinement, for periods of three months or more. In sum, I am an internationally recognized expert in solitary confinement and related practices. My expertise in prison standards and conditions of confinement informs my evaluation of this case.

3. I have focused on the history of gang validations, solitary confinement placements, and hunger strikes in California state prisons, especially. Ten of my peer-reviewed and law review articles, as well as three of my book chapters, focus on California correctional practices and history specifically.

4. My curriculum vitae is attached as Appendix A, which includes a list of all publications I have authored in the last ten years.

5. In the last five years, I have either filed an expert opinion and/or testified at trial in four other cases: *United States v. Cervantes*, Case No. 4:21-cr-328-YGR (N.D. Cal. 2024); *People v. Souzer*, Case No. 22ZF0010 (Orange Co. Sup. Ct. 2023), *Johnson v. Dye, et al.*, Case No. 3:19-cv-00444 (S.D. Ill. 2021); and *People v. Panasitti*, Case No. 04HF1451 (Orange Co. Sup. Ct. 2018). I also served as an expert in *British Columbia Civil Liberties*

# EXHIBIT "A"

# EXHIBIT "A"

*Association and the John Howard Society of Canada v. Attorney General of Canada*, SCBC Vancouver Registry No. S-150415 (Report dated August 31, 2015).

6. I am being compensated at the rate of $300 per hour for reviewing evidence and preparing this Report, and I would be compensated at the same rate for preparing for and testifying in this case.

## II.   Basis of Expert Opinion

7. I have been retained by counsel in *U.S. v. Yandell* to provide an overview of the history of retaliatory prosecutions and other adverse actions against people either alleged to be affiliated with gangs and/or held in solitary confinement in California state prisons over the last forty years.

8. In writing this report, I have reviewed my own work, as well as recent legal cases and news reports, concerning (1) the history of prison conditions litigation and reform in California and (2) the legal responses and strategies of state prison officials in response to litigation and reform. The opinions expressed herein are based on my own direct analyses of archival documents, correctional data, and interviews and evaluations I have conducted with California prison staff and former prisoners, as well as on my reviews of extensive legal archives and published literature on prison conditions litigation and reform in California.

## III.   The Pelican Bay Hunger Strikes & Patterns of Retaliation, 2011-2023

9. <u>Pelican Bay Hunger Strikes, Timeline and Context</u>: The Pelican Bay hunger strikes took place between 2011 and 2013 and led directly to significant reforms to the use of solitary confinement in California prisons; the strike leaders received significant media attention in the 2010s and continued attention within the California Department of Corrections and Rehabilitation (CDCR) since. Todd Ashker and Danny Troxell, "on behalf of themselves and similarly situated participants" signed a letter on April 3, 2011, in which they committed to begin an indefinite hunger strike on July 1, unless CDCR agreed to reforms to placement policies and conditions in the Pelican Bay Security Housing Unit (SHU).[1] Subsequent letters identified the other key leaders of the hunger strikes, including Ronnie Yandell, a named defendant in the instant prosecution, along with fifteen other prisoners, each identifying as African American, Latino, and white, and all associated, according to either CDCR or their own statements, with different, rival prison gangs (Aryan Brotherhood, Black Guerilla Family, Mexican Mafia, and Nuestra Familia).[2] "Each signatory was serving an indefinite term in solitary confinement in the Pelican Bay SHU."[3] The "Agreement to End Hostilities" represented an explicit agreement to "put an end to

---

[1] Todd Ashker and Danny Troxell, "Final Notice: PBSP SHU D-Corridor Hunger Strike," Apr. 3, 2011,
https://ccrjustice.org/sites/default/files/attach/2015/07/Pelican%20Bay%20SHU%20Five%20Core%20Demands.pdf.
[2] Pelican Bay State Prison-Security Housing Unit Short Corridor Hunger Strike Representatives "Agreement to End Hostilities," Aug. 12, 2012,
https://ccrjustice.org/sites/default/files/attach/2015/07/Agreement%20to%20End%20Hostilities.pdf.
[3] Keramet Reiter, "Law's Infamy: *Ashker v. Brown* and the Failures of Solitary Confinement Reform," LAW'S INFAMY, in the Amherst Series in Law, Jurisprudence, and Social Thought, Austin Sarat, ed., New York University Press: 176-212, at 183.

more than 20-30 years of hostilities between our racial groups" by decreeing that as of October 10, 2012, "all hostilities between our racial groups…will officially cease." The Agreement also identified solitary confinement as "CDCR's torture tactics intended to coerce one to become a state informant via debriefing" and warned prisoners to be aware that CDCR would take actions designed to disrupt the Agreement and to use prisoners 'against each other" for the benefit of the gang units.[4]

10. More than 5,000 prisoners across the state indeed started refusing meals on July 1, 2011.[5] "The strike went on for three weeks—until the undersecretary of corrections in the state agreed to sit down, in person, with the strike leaders. At that meeting, Undersecretary Scott Kernan agreed to reconsider many of the policies the prisoners were protesting."[6] The strike leaders coordinated two more strikes over the next two years. Two years later, "the lawyers representing Ashker and Troxell had sought and won class certification on behalf of all 500-plus prisoners who had been in solitary confinement for ten years or more … In August 2015, the *Ashker* settlement officially 'prohibited the assignment of prisoners to the SHU based solely on their status as gang members, capped all stays in the SHU at five years, made the provisions retroactive, and required prison officials to provide prisoners' lawyers monthly data reports for two years about the characteristics of the SHU population.'"[7] More specifically, the settlement promised that "the very *Ashker* class members prison officials had asserted were irredeemably dangerous would be released from the Pelican Bay SHU into the general prison population" and that "prison officials would be trained to better assess the accuracy of confidential information used against prisoners."[8]

11. Group Retaliation: California state prison officials responded to the hunger strikes with a multi-pronged effort to undermine both the strikers' claims and their ability to organize: demonizing hunger strikers as dangerous, attempting to discredit class members as lying and manipulative, attempting to moot class members' legal claims, illegally returning class members to solitary confinement based on discredited confidential information, and denying class members parole based on discredited confidential information. Prison records, journalistic investigations, and judicial decisions alike corroborate each of these retaliatory tactics.

    a. *Demonizing hunger strikers:* First, state prison leadership repeatedly described the prison organizers of the non-violent hunger strike as dangerous criminals, engaged in tactics of violent manipulation, justifying their conditions of solitary confinement. In 2011, Terry Thornton, spokesperson for CDCR, said: "The department is not going to be coerced or manipulated . . . That so many inmates in other prisons throughout the state are involved really demonstrates how these gangs

---

[4] Pelican Bay State Prison-Security Housing Unit Short Corridor Hunger Strike Representatives "Agreement to End Hostilities," *supra* note 2.

[5] Keramet Reiter, *23/7: Pelican Bay Prison and the Rise of Long-Term Solitary Confinement* (2016): 30.

[6] Reiter, "Law's Infamy," *supra* note 3:185; Keramet Reiter, "The Pelican Bay Hunger Strike: Resistance within the Structural Constraints of a U.S. Supermax Prison," SOUTH ATLANTIC QUARTERLY, 113.3: 579–611.

[7] Reiter, "Law's Infamy," *supra* note 3:186-7; Reiter, 23/7, *supra* note 5: 202.

[8] Reiter, "Law's Infamy," *supra* note 3:191; Notice of Joint Motion, *Ashker v. Brown*, Case No. 09–5796CW, Sept. 1, 2015.

can influence other inmates, which is one of the reasons we have security housing units in the first place."[9] In 2013, facing ongoing hunger strikes and litigation, Secretary of Corrections Jeffrey Beard publicly described the hunger strikers, although they were engaging in non-violent action, as "convicted murderers who are putting lives at risk to advance their own agenda of violence."[10] In an interview that same summer, Terri McDonald, a recently retired CDCR Secretary of Corrections, reiterated the interpretation of the hunger strikers as engaged in manipulative violence: "They are terrorists."[11] As I wrote previously, "the scale and duration of the nonviolent hunger strike, involving sustained collaboration of alleged rival gang leaders, provided a wordless but decisive rebuttal to Beard's assertions."[12] Indeed, just two years later, Terry Thornton, the 2011 spokesperson, would backtrack on her own, Beard's, and McDonald's claims, noting that the indeterminate solitary confinement procedures hunger strikers were protesting were "unfortunate" and no longer in place: "Unfortunately, they would just keep somebody in the SHU based on this kind of evidence [the word of confidential informants or on one document, such as a drawing]," she said.[13]

b. *Discrediting class members:* Second, prison officials sought to directly discredit the hunger strike organizers and named *Ashker* plaintiffs throughout the course of the litigation challenging solitary confinement placement procedures in CDCR. In 2013, state prison officials filed seven affidavits from prisoners who had de-briefed, or formally renounced their gang memberships; each statement described Ashker and the other strike leaders as active gang members, "advancing agendas of violence," coercing participation in both the hunger strikes and the lawsuit.[14]

c. *Mooting Claims:* Third, between 2013 and 2015, state prison officials sought to avoid (and moot) the *Ashker* litigation by moving prisoners out of the Pelican Bay SHU into other facilities, attempting to reduce the number of prisoners eligible to join the *Ashker* class of all prisoners who had been in the Pelican Bay SHU for ten or more years. Specifically, "after Judge Claudia Wilken certified the class of 500 prisoners who had spent more than 10 years in the SHU (in June of 2014), prison officials transferred 8 of the 10 named *Ashker* plaintiffs out of the Pelican Bay SHU. Undeterred, Judge Wilken issued an order in March of 2015 permitting these

---

[9] Ian Lovett, "California Inmates Fast to Protest Isolation Cells," NEW YORK TIMES, July 8, 2011.

[10] Jeffrey Beard, "Editorial: Hunger Strike in California Prisons Is a Gang Power Play," LOS ANGELES TIMES, Aug. 6. 2013. http://articles.latimes.com/2013/aug/06/opinion/la-oe-beard-prison-hunger-strike-20130806.

[11] Paige St. John, "Prison Hunger Strike Leaders Are in Solitary but Not Alone," LOS ANGELES TIMES, July 28, 2013, www.latimes.com/news/local/la-me-ff-ashker-20130729,0,1059923.story.

[12] Keramet Reiter, "(Un)Settling Solitary in California," SOCIAL JUSTICE, Sept. 28, http://www.socialjusticejournal.org/?p=3214.

[13] Jessie Lau, "Incarceration to Convocation—Life After Solitary Confinement: How Education Paved the Way for Danny Murillo," BERKELEY DAILY CALIFORNIAN, May 10, 2015.

[14] Reiter, 23/7, *supra* note 5: 198; *Ashker v. Schwarzenegger,* Case No. C05-3286 CW, U.S. Dist. LEXIS 25092 (N.D. Cal., Oakland Div., filed Jan. 30, 2006), later renamed *Ashker v. Brown*, Case No. 4:09-cv-05796-CW (N.D. Cal., Oakland Div.), "Declaration of J. Bryan Elrod in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification," July 11, 2013.

plaintiffs to continue to serve as class representatives."[15] In the aftermath of the *Ashker* settlement, state prison officials have continued to engage in public and administrative actions to discredit the prisoners who engaged in the hunger strikes and the *Ashker* litigation and to undermine legally mandated reforms around limiting placements in and durations of solitary confinement.

   d.  *Returns to solitary based on confidential information:* Fourth, prison officials have repeatedly used confidential information, discredited as unreliable and inaccurate in the initial *Ashker* settlement, to return class members to solitary confinement in security housing units. "On the basis of reviews of 'about 40' files, details of which were largely redacted even from the plaintiffs' published motion, lawyers from the Center for Constitutional Rights concluded that prison officials had 'fabricated or improperly disclosed confidential information' and repeatedly failed to ensure that 'confidential information is accurate [and] reliable.'"[16] The court extended the settlement agreement for two years as a result of this analysis, explicitly noting that "systemic and ongoing due process violations exist—namely, the systemic misuse of confidential information in what appear to be meaningless disciplinary hearings such as to return class members to solitary confinement." In its analysis, the court "reviewed seven different cases in which prisoner class members received rule violation reports stating that confidential information existed or was reliable, when in fact no such information existed, the information had already been determined to be unreliable, or contradictory evidence existed and had not been disclosed to the prisoner." Almost half of 110 disciplinary cases reviewed by plaintiffs and the court had relied on discredited, unreliable, or non-existent information.[17]

   e.  *Movement to Facilities with SHU-like conditions:* Fifth, prison class members have been moved to one of four different categories of facilities where the conditions of confinement are substantively similar to the conditions they experienced in the Pelican Bay SHU, again, often based on confidential information discredited as unreliable and inaccurate: (1) Level IV facilities, where they have as little as one hour per day outside their cells, less time than they had in the Pelican Bay SHU; (2) Restricted Custody General Population (RCGP) units, justified as a place to facilitate transition from the SHU to the general prison population, practically functioning as a highly restrictive indefinite confinement space; (3) administrative segregation facilities, where class members have been placed pending investigation

---

[15] Reiter, "(Un)Settling Solitary," *supra* note 12; *Ashker v. Schwarzenegger,* Case No. C05-3286 CW, U.S. Dist. LEXIS 25092 (N.D. Cal., Oakland Div., filed Jan. 30, 2006), later renamed *Ashker v. Brown,* Case No. 4:09-cv-05796-CW (N.D. Cal., Oakland Div.), "Order Granting Leave for Motion to File a Supplemental Complaint," Mar. 9, 2015.

[16] Reiter, "Law's Infamy," *supra* note 3: 189; Motion for Extension of Settlement Agreement Based on Systemic Due Process Violations, *Ashker v. Brown,* Case No. 09–5796CW, Feb. 6, 2018, https://ccrjustice.org.

[17] Order, *Ashker v. Brown,* Case No. 09–5796CW, Jan. 25, 2019, https://ccrjustice.org; Reiter, "Law's Infamy," *supra* note 3: 193; Order Extending the Settlement Agreement, *Ashker v. Newsom,* Case No.09–5796CW Apr. 9, 2021, reversed on other grounds, 81 F4th 863, 894 (9th Cir. August 24, 2023); https://ccrjustice.org; Maria Endicott, "A 2015 Case Was Supposed to Overhaul California's Solitary Confinement. The Reality Is Much More Complicated," MOTHER JONES, Feb. 13, 2019, www.motherjones.com.

of confidential information about security threats and potential attacks;[18] (4) federal facilities, such as in the instant prosecution, with conditions that amount to solitary confinement. Relatedly, in the *Ashker* litigation, the court identified nine specific cases in which state prison officials transferred prisoner class members into the RCGP "based on claims that they constituted a general threat to institutional security, essentially restricting a class member's liberty based on their status, rather than based on a specific rule violation as required by the terms of the *Ashker* settlement."[19]

f. *Denials of parole based on confidential information:* Sixth, prison and parole officials have repeatedly used confidential information, discredited as unreliable and inaccurate in the initial *Ashker* settlement, to deny class members parole. In the 2019 court order extending the *Ashker* settlement, the court noted that "prisoners with disciplinary records indicating that they had previously been housed in the SHU were systematically being denied parole."[20] As I have previously explained: "CDCR officials maintained gang validation records in prisoners' files (with no acknowledgement of their discrediting) and transmitted the files to the parole commissioners." When formerly gang-validated prisoners then attempt to explain "the repudiation of the gang validation process" at parole hearings, parole commissioners "interpret these 'defenses' as dishonest, lacking both credibility and remorse," and deny the candidate parole.[21]

12. In sum, during and following the *Ashker* litigation, California state prison officials have repeatedly and systematically used inaccurate and discredited claims about prisoner gang membership and dangerousness to contradict prisoners' claims of mis-treatment, justify prisoner placement and re-placement in solitary confinement and other restrictive conditions of confinement, and, even, deny them parole.

13. Individual Retaliation: In addition to using inaccurate and discredited information to justify continued solitary confinement placement and deny individuals parole, California prison officials have also used this information to target individual, alleged gang members with new criminal charges. Specifically, at least six of those either named as *Ashker* class members or signing the original "Agreement to End Hostilities" have faced new criminal prosecutions in the aftermath of the case: Danny Troxell and Ronnie Yandell; Gabriel Huerta; and Antonio Guillen, George Franco, and James Perez.

a. On May 21, 2019, the U.S. Attorney's office in Sacramento filed a formal criminal complaint in this matter, *United States v. Yandell*, "against eleven alleged Aryan Brotherhood prison gang members from across the state prison system, including, most notably, Danny Troxell."[22] Danny Troxell was Ashker's cosignatory on the

---

[18] Reiter, "Law's Infamy," *supra* note 3: 188; Victoria Law, "As Long as Solitary Exists, They Will Find a Way to Use It," THE NATION, Jul. 13, 2018, www.thenation.com.

[19] Reiter, "Law's Infamy," *supra* note 3: 193; Order, *Ashker v. Brown*, Jan. 25, 2019, 11–12.

[20] Reiter, "Law's Infamy," *supra* note 3: 193; Order, *Ashker v. Brown*, Case No. 09–5796CW, Jan. 25, 2019, https://ccrjustice.org.

[21] Reiter, "Law's Infamy," *supra* note 3: 194; Order, *Ashker v. Brown*, Jan. 25, 2019, 15.

[22] Reiter, "Law's Infamy," *supra* note 3: 195.

initial 2011 hunger strike demand letter and one of the named plaintiffs in the *Ashker* case. The *Yandell* complaint "alleges that the defendants, including Troxell, had been involved in conspiracies to commit murder and traffic drugs."[23] The investigations uncovering these conspiracies began in 2014, just one year after the conclusion of the series of hunger strikes Troxell coordinated with Ashker, with the explicit goals of both raising awareness of the conditions of confinement in solitary and questioning the gang validation policies justifying indefinite periods of solitary confinement. The 2019 *Yandell* complaint explicitly connects the prosecution for criminal conspiracy to the hunger strikes and *Ashker* litigation. Brian Nehring, a special agent with the Drug Enforcement Administration, said that the *Ashker* settlement "required CDCR to release extraordinarily dangerous prison gang members from the Pelican Bay SHU into less-stringent California prison environments ... [and] created a growth opportunity for the Aryan Brotherhood ... [making Yandell] a direct beneficiary of the *Ashker* settlement."[24] Nehring's affidavit also describes the "purported" hunger strike as "mostly an illusion." Nehring's statements suggesting that the 2011-2013 hunger strikes were somehow not real ignore a "broad body of evidence—from the United Nations Special Rapporteur on Torture, Amnesty International, and individual interviews with *Ashker* class members to the fact that the state was worried enough about hunger-striking prisoners to publicly seek a controversial 'force feeding order.'"[25] In sum, the *Yandell* complaint acknowledged targeting *Ashker* class members for prosecution because of their status as class members, referenced claims about "dangerous prison gang members" that were successfully challenged and undermined in the *Ashker* litigation, and even called into question the reality of the hunger strikes themselves, further undermining the prisoners' actions.

b. In December 2023, the *Los Angeles Times* reported that Los Angeles County prosecutors had filed another formal criminal complaint against another *Ashker* class member and signatory on the 2011 hunger strike demand letter: Gabriel Huerta.[26] Huerta testified at his last parole hearing in 2017 that he had "pulled away" from the Mexican Mafia, but he, like many of the *Ashker* class members, confronted prison records claiming he was a validated gang member, records that had been questioned as inaccurate and unreliable in the *Ashker* litigation.[27] As with Troxell, Huerta's involvement with the hunger strikes and *Ashker* litigation is explicitly referenced as evidence of his gang membership and dangerousness.

c. A similar indictment in *United States v. Cervantes, et al.* names as defendants *Ashker* class members, including both named and unnamed members, as well as participants in and/or key organizers of the hunger strikes.

---

[23] *Id.*

[24] Affidavit in Support of Criminal Complaint, U.S. v. Yandell, Case No. 2:19-MJ-0080-CKD, May 21, 2019, 24-26; Reiter, "Law's Infamy," *supra* note 1: 196.

[25] *Id.*; Reiter, "Law's Infamy," *supra* note 1: 196.

[26] Matthew Ormseth, "A surprising new tactic against a reputed Mexican Mafia boss. Will it work?" *Los Angeles Times*, Dec. 26, 2023.

[27] Id.

7

## IV.  Empirical Analysis of the *Ashker* Settlement's Limited Impacts, 2015-2023

14. Although prison officials and prosecutors claim that the *Ashker* class members are dangerous gang members and that the *Ashker* settlement required CDCR staff to "release extraordinarily dangerous gang members" from solitary confinement, empirical analyses of CDCR's own publicly available data reveal that (1) solitary confinement use in the state has not declined as significantly as prison officials allege and (2) the alleged gang members released from solitary confinement have not contributed to violence within the state prison system.

15. Solitary confinement use remains significant: According to a U.C. Davis analysis of publicly available CDCR housing data: "Between 2012 and 2022 the rate of solitary confinement in SHU fell 95.05% (from 3.09 to 0.15), but the rate of solitary in all other non-SHU prison units combined only fell 44.81% (from 5.86 to 3.24). Between 2016 and 2022 the rate of solitary confinement in non-SHU units actually rose by 22.84% (from 2.63 to 3.24)."[28] In other words, while overall solitary confinement use has decreased in California, especially since the implementation of the *Ashker* settlement in 2015, it still remains significant, with more than 4,000 people, or close to 4 percent of the state prison population, in some form of solitary confinement on any given day. In other words, solitary confinement remains a highly and flexibly available tool for California prison officials.

16. Limited evidence of increased violence with decreased solitary usage: According to a U.C. Davis analysis of publicly available CDCR COMPSTAT data about violent incidents, rates of solitary confinement use are *unrelated* to rates of murder, attempted murder, and assault between prisoners. Rates of solitary confinement use are only very weakly associated with assaults by prisoners against staff and the less serious incidents of battery between prisoners. "Overall, the data suggests that solitary usage has little to no association with rates of institutional violence between prisoners and only a weak association with violence against staff."[29]

17. In the 2010s, when California prison officials began evaluating the indeterminate commitments to solitary confinement cases under scrutiny in the *Ashker* litigation, the rates of eligibility for release from solitary confinement were shockingly high. "In 828 initial file reviews, all but 40 prisoners (95 percent of all reviewed files) were found eligible either to enter a program to transition out of the SHU or to be returned directly to the general prison population."[30] Whether the gang validation procedure had an extraordinarily high error rate, or the underlying validation criteria were flawed, evidence in the *Ashker* case suggests that the state is neither as overwhelmed with gang members nor as unable to contain them as it claims.

---

[28] Konrad Franco, "Unlocking the Truth: Solitary Confinement Persists in California Prisons, Harms the Incarcerated, and is Ineffective at Reducing Violence," July 14, 2023, working paper on file with author: 5.
[29] Id.
[30] Reiter, 23/7, *supra* note 5: 15.

V.     **History of Retaliation Against California Prisoners Accused of Gang Affiliations and Organizing for Improved Conditions, 1971 - 2011**

18. Group Retaliation: California state prison officials have a decades-long history of orchestrating high-profile violent incidents in order to either establish or legitimize their claims that people in their most secure facilities are extremely violent. The Gladiator Fights at Corcoran State Prison in the early 1990s and the riot during Judge Henderson's September 1993 visit to Pelican Bay State Prison are representative of this pattern.

   a. *The Gladiator Fights:* Between 1989 and 1994, "Guards killed five prisoners in the Corcoran SHU and injured another forty … Most of these injuries, and all five deaths, stemmed from 'gladiator fights' staged by the guards. Guards would choose two prisoners known to be from enemy gangs and release them into the exercise yards attached to the corridors of SHU cells. The two rivals would fight each other, and when the fights got heated, guards would shoot the prisoners—in five instances … the gladiator fights created a media sensation in the late 1990s."[31]

   b. *The Pelican Bay Riot Orchestrated for Judge Henderson:* In September of 1993, following a *60 Minutes* exposé of the abuses at Pelican Bay State prison, and on the eve of a ten-week trial evaluating the constitutionality of the extremely restrictive conditions of confinement at the prison, Judge Thelton Henderson made a visit, with three of his law clerks, to Pelican Bay. "At the prison, the officers leading Henderson's tour suggested that he see the prison yard from above by climbing one of the guard towers . . . He and his clerk, Karen Kramer, ascended a narrow spiral stairway … Two other law clerks remained below in the prison yard … When he got to the top of the tower and looked down at the yard, Henderson found it in chaos: 'Everyone was spread out, including my law clerks, in their suits.' In the time it had taken him to ascend the stairs, a riot had apparently broken out. Guards had rushed on to the scene and ordered everyone to lie flat on their stomachs … A subsequent investigation revealed that two guards, Jose Garcia and Michael Powers, had set up two prisoners convicted of sexual assaults to be attacked in the yard as Judge Henderson watched. The guards knew that other prisoners had shanks—prison-made knives—hidden away and would bring them out into the yard for the attack. Since they expected the attack, Garcia and Powers were able to quiet things down quickly. After a ten-year investigation and prosecution, they were ultimately convicted and sentenced to six and seven years, respectively, for conspiracy to violate prisoners' civil rights.[32]

19. While the Corcoran gladiator fights and the riot during Thelton Henderson's visit to Pelican Bay took place thirty years ago, these events reverberate for prisoners still in solitary

---

[31] Reiter, 23/7, *supra* note 5: 21; Matthew Heller, "They Shoot Prisoners, Don't They?" INDEPENDENT, Jan. 28, 2001.

[32] Reiter, 23/7, *supra* note 5: 133; Thelton Henderson, Former chief judge, U.S. District Court for the Northern District of California, personal interview with the author, San Francisco, Calif., May 24, 2011, notes on file with the author; Associated Press, "Guards Convicted of Plotting Attacks," SAN DIEGO UNION TRIBUNE, May 16, 2002; *U.S. v. Powers*, Case No. 3:00-cr-00105-MJJ-2; U.S. Department of Justice, Executive Office for United States Attorneys, United States Attorneys' Annual Statistical Report, Fiscal Year 2002.

confinement, who experienced these events, and staff in California prisons, accustomed to orchestrating narratives about uncontrollable violence, and referencing and relying on these narratives, to justify the continued use of solitary confinement, new criminal prosecutions, and parole denials. Indeed, the California correctional officials who designed the Pelican Bay SHU in the 1980s "explained the facility was a necessary response to the 1970s era of collective organizing in prison … the era of uncontrollable violence, led by George Jackson and Black Panther affiliates."[33]

20. Individual Retaliation: California state prison officials have a decades long history of targeting individual, alleged gang members for both prosecution and physical abuse. The associates of George Jackson, widely credited with being a founder of the Black Guerilla Family, and Todd Ashker, an alleged Aryan Brotherhood member, are two of the most notorious and representative examples.

    a. *George Jackson's Associates:* On August 21, 1971, the single deadliest day in California prison history (until the COVID-19 pandemic), George Jackson, two prisoners, and three guards died at San Quentin state prison. George Jackson was an international best-selling author known for his pointed critiques of criminal sentencing policies and California prison conditions. While exactly who killed whom is still disputed, six prisoners (the San Quentin Six: Fleeta Drumgo, David Johnson, Johnny Larry Spain, Willie Tate, Luis Talamantez, and Hugo Pinell) ultimately faced murder charges for the August 1971 carnage. However, four were ultimately acquitted of all charges; only David Johnson and Hugo Pinnell were convicted of non-homicide assault charges. In spite of his relatively minor underlying conviction, Hugo Pinell remained incarcerated until his death in prison in 2015, including spending 45 years in solitary confinement, and receiving nine separate parole denials. Prison officials repeatedly used unproven and discredited claims that Pinell was responsible for the six August 1971 deaths at San Quentin State Prison to justify both his decades-long solitary confinement and his parole denials.[34] At least through the early 2010's a prisoners' "slightest association with Jackson's legacy justifies everything from execution to permanent solitary confinement." In 2005, for instance, then-Governor Schwarzenegger denied outspoken nonviolence advocate Tookie Williams's clemency petition, referencing Williams's "inclusion of George Jackson in the dedication of one of his books" as evidence of continued criminal and violent tendencies. State prison officials subsequently executed Williams.[35] In 2011, state "prison officials 'revalidated' Ronnie Sitawa Dewberry's Black Guerilla Family membership," extending his

[33] Reiter, "Law's Infamy," *supra* note 1: 190; Reiter, 23/7, 34–58.

[34] Reiter, *23/7, supra* note 5: 1-2, 51-52; Daniel P. Scarborough, *Incident at San Quentin: How a Pistol Was Smuggled into San Quentin* (2022); Time, "The Law: The Longest Trial," July 19, 1976, http://content.time.com/time/.
magazine/article/0,9171,914334,00.html (subscription required).

[35] Reiter, 23/7, *supra* note 5: 53-4; Dan Berger, "America's Fortress of Blood: The Death of George Jackson and the Birth of the Prison-Industrial Complex," SALON, Sept. 7, 2014. www.salon.com/
2014/09/07/americas_fortress_of_blood_the_death_of_george_jackson_and_the
_birth_of_the_prison_industrial_complex; Dan Berger, "Two Prisoners Named Williams." NATION, Dec. 26, 2005. www.thenation.com/article/two-prisoners-named-williams#.

indefinite placement in solitary confinement, based on his possession of three photographs of George Jackson, "a symbol of [his] dedication to the gang."[36]

    b. *Todd Ashker:* Todd Ashker killed Dennis Murphy on May 25, 1987. Just one year later, California prison officials validated him as a member of the Aryan brotherhood based on "inmate confidential informants" claims. At the trial for the murder of Dennis Murphy, two years later, prosecutors claimed Ashker committed the murder for the Aryan Brotherhood, but the defense disputed the claim. The jury convicted Ashker of second-degree murder, unconvinced by the claims of his gang affiliation and pre-planning that would have justified a first-degree conviction. Nonetheless, prison officials relied on the claim, formally rejected by a jury, that Ashker had engaged in an "Aryan Brotherhood ordered hit" as justification for both maintaining Todd Ashker in continuous solitary confinement at Pelican Bay State prison for the next 25 years and denying Ashker's petitions for parole.[37] Importantly, federal prosecutors began investigating Aryan Brotherhood members and developing a federal case against them in 1992, just after Ashker's case was resolved.[38]

21. The treatment both George Jackson's alleged co-conspirators and Todd Ashker experienced in California state prisons is representative of a pattern of retaliation – in the form of solitary confinement placements, criminal charges, and parole denials – against individual state prisoners. Indeed, this pattern was explicitly acknowledged in the *Ashker* litigation, when the court ordered both Pinell and Ashker to be considered for release from the Pelican Bay SHU. Allegations of gang membership or wrongdoing, formally rejected in state and federal court legal proceedings, have constituted persistent and repeated justifications for the solitary confinement placements, criminal charges, and parole denials, of California prisoners, during the *Ashker* litigation, but for decades before that as well.

## VI. There is a reasonable probability that the defendants in this Case are Being Subjected to a Familiar Pattern of Retaliation

22. Defendants Troxell and Yandell in this federal prosecution were signatories on the original letter committing to organize a hunger strike; Troxell was a named plaintiff in the *Ashker* case; and other defendants in this case were members of the *Ashker* class. Like Gabriel Huerta, Antonio Guillen, George Franco, and James Perez (and George Jackson's alleged co-conspirators), they are facing a new criminal prosecution, leveraging decades of discredited information about their alleged gang membership and dangerous activity. The defendants in this case faced a reasonable probability of vindictive prosecution when they

---

[36] Reiter, 23/7, *supra* note 5: 54; *Ashker v. Schwarzenegger,* Case No. C05-3286 CW, U.S. Dist. LEXIS 25092 (N.D. Cal.,

Oakland Div., filed Jan. 30, 2006), later renamed *Ashker v. Brown,* Case No. 4:09-cv-

05796-CW (N.D. Cal., Oakland Div.), "Exhibit D," attached to "Declaration of Ronnie Dewberry, in Support of Plaintiffs' Motion for Class Certification," Doc. 195-1, May 2, 2013.

[37] Reiter, 23/7, *supra* note 5: 14-19; Wayne Wilson, "Prison Killer Gets 21-Years-to-Life Term," SACRAMENTO BEE, Apr. 24, 1990; *Ashker v. Schwarzenegger, supra* note 36:"Request for Admissions, Set. No. 1," para. 94.

[38] David Grann, "The Brand," THE NEW YORKER, Vol. 80.1: 156-71.

engaged in the hunger strike and *Ashker* litigation.[39] This investigation of defendants, this prosecution of defendants, and other adverse actions against the defendants in this case are consistent with the history of retaliation in CDCR against hunger strikers, *Ashker* class members, and others who have exercised constitutional rights from within CDCR. The types of charges faced by defendants involve conduct that is commonplace amongst California prisoners and would not, on its face, appear to be so unusual as to explain federal prosecution for defendants already serving state life sentences. For example, CDCR's own statistics for October 2022 through September 2023 show that there were literally thousands of cases of prisoners possessing or selling drugs; in the same time period, there were 18 homicides, 57 cases of battery with a weapon causing serious bodily injury, and over 500 cases of battery without a weapon causing serious bodily injury.[40] In other words, drug sales and serious assaults are events that routinely occur and are handled either within CDCR or by local prosecution.

23. Defendants, like the dozens of *Ashker* class members CDCR moved out of Pelican Bay in the 2010s in a blatant attempt to moot the *Ashker* litigation, and the hundreds of former class members being held in new solitary confinement units like the RCGPs, were moved to federal pretrial confinement akin to solitary confinement. If convicted, defendants are facing movement to a new (federal) facility, where they may be subject again to solitary confinement, again negating the protections against these conditions they fought so hard to establish as *Ashker* class members. This is consistent with the history of resistance to court-imposed limits to the use of solitary confinement in CDCR.

If new information comes to light or new documents are provided, I may have additional or updated opinions to provide.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Executed on January 11, 2024 at Irvine, California        By: *Keramet Reiter*
                                                               _____
                                                               Dr. Keramet Reiter

---

[39] *U.S. v. Jenkins*, 504 F.3d 694 (9th Cir. 2007).
[40] California Department of Corrections and Rehabilitation Division of Correctional Policy Research and Internal Oversight Office of Research, "COMPSTAT Incident Report," November 1, 2023,

Exhibit B

Declration of Brant Daniel,

   I, Brant Daniel, Declare :

   1.  On Oct 29, 2016, I was taken off G.P. main
line yard in Salinas Valley state prison, and
charged with murder, and placed in adseg.
   2.  Shortly thereafter while in adseg for this
murder, starting in Jan 2017 ; I su: Bitter,
Isu: Deanzo, and several officers in Salinas
(SVSP) Valley would come to my cell and tell
me, "you're a dead man Daniel, Ronnie's going to
kill you for this. We got word you owed massive
amts of drug money and Ronnie put a target on
your back." Isu: Deanzo told me this more
than anybody in adseg there at Salinas Valley. He'd
come by my yard cages, my cell all the time
making such statements.
   3.  Several inmate informants would come and
tell me, "Ronnie and Billy hate you. They put you
in the hat, and said anyone any race can kill you
Brant!"
   4.  In June 2017, I was transferred to Pelican Bay
SHU. upon arriving there several unknown Isu
cops came to get me off the bus and told me, "you
are marked for death our buddies in Salinas Valley
already told us.'"

                    ①    →

5. Approx 5 days later after my arrival in Pelican Bay, I was put back on the bus and sent to Corcoran SHU due to the Ashker case I could n't be in Pelican Bay SHU.

6. On July 2nd 2017, I arrived in Corcoran SHU. Several ISU cops would pull me outta my cell under bogus 602 appeal hearing and ISU: Woodward told me," We know you are going to get killed. Ronnie's after you, and wants you dead." ISU cops would search my cell and escort me to the holding cage and tell me," Walking dead man here! Boy you owed big money and killed for no reason Ronnie already put it all out there on you it's over, you may as well debrief Daniel!"

7. In June or July of 2018, ISU: Bittner and Dearzo visited Corcoran SHU from Salinas, and came past my yard cage and told me," You never go to a main line again MR. Dead Man. We got your kites trying to tell Ronnie your side of the story."

They knew I tried to reach out via correspondence with friends of mine trying to tell them the truth of what really happend in Salinas Valley on Oct 29, 2016. They Victem threw very Hot coffee in my face & body, and nobody knew this CDCr and OCS, IGI all wanted the missing facts surpressed from me!

②

7. Isu in Corcoran SHu gave out my wife's phone # and address to Inmates debriefing who'd then would go and write it all on holding cell walls in medical.

8. Isu had debriefers send me homosexual book via mail in Ronnie's name, and two (2) letters threatening to kill me. Debriefers told me many times they were going to kill and rape my wife, and I need to PC up, and they'd all protect me!

9. On Feb 14, 2019, DCS: Perryman had me pulled out under guise of 602 hearing. He and 4 other unknown OCI agents showed me an alleged kill kite, and said, "Ronnie wrote it," and "we can protect you Daniel. That Murder was for nothing and everyone knows it. Yeah, we know he threw coffee on you but you killed him. That was Cowardly!" I said, "Fuck off! I don't know shit!" Perryman kept repeating "coward act man," I did NOT Debrief nor ever will!

10. On July 8, 2019, I was transferred to CSP SAC adseg for my RICO case.

11. Upon my arrival in CSP SAC adseg ISU: Ramirez, Lee, and several c/o' would tell me "the Brothers want your head Daniel! You need to debrief dude!" They used many inmate snitches to spread slander on me in CSP SAC, and all over CDCR prisons, then come tell me how much of a dead man I am!

(3)

12. c/o Sullivan, c/o Arther in adseg gave out my legal mail, and wife's letters to known sny snitch I/m's here in adseg to pass around, all to try to pressure me.

13. In Oct 2020, Isu: Ramirez & Lee searched my cell, and planted a knife, and concocted a plot story that I was going to kill c/o Arther. They moved me to a psyc unit, P.S.U. that is only for the most severe mentally ill inmates.

Isu: Ramirez, Lee and SGT Anderson went to the Gen. Pop., and told other fellow white I/m's that I debriefed finally, and then they came and told me they did this to me, so I might as well do it "debrief!"

In Aug 2022, I was completely found NOT GUILTY of this falsified write up.

14. DCS: Perryman, Isu in all prisons I been to after OCT 29, 2016 plotted on me using my friends to do so. Perryman lied on me, and knew my part of the story could not get out. He knew he had to keep me completely isolated from Ronnie and rest of my friends and he did so!!

I Brant Daniel declare under penalty of perjury the foregoing is true and correct to the best of my knowledge.

x Brant Daniel J-85963
July 17, 2024

④

Declaration of Brant Daniel,

   I Brant Daniel Declare:

   1.  In 2017 — 2019, while I was housed in Corcoran State Prison SHU, I had seen several debrief inmates who were in Salinas Valley State Prison General population B yard in 2016 at the time of Oct 2016 when I was charged for Murder.

   2.  In Corcoran SHU, the debriefing inmates that were in SVSP in 2016 with me would walk past my rec. yard cage and yell, " You are a fucking coward, and we lied on your dumb ass to the cops, and D.A.!! You are a coward!"

   3.  These debriefers admitted that they lied about me to cops and D.A. almost every time they walked past my yard cage in Corcoran SHU 2017 — 19.

   4.  In 2019, I was charged in a Fed. Rico case in the East Dist. of California.

   5.  In 2022, My Fed. Attorneys showed me Confidential document memo from the 4 debriefing inmates in Corcora SHU.

①

→

6. I couldn't keep them just read them while being held up. The 4 debriefers had told I.G.I that I was a coward & I owed lots of drug money.

7. I knew who the memos belonged to, due to their admissions to me while house in Corcoran stu 2017 - 19. The debriefers themselves told me what they told while debriefing to I.G.I. It matched what I seen in my confidenti file. I read what they said they told I.G.I on the very memos that are in my file.

I Brant Daniel declare under penalty of perjury the foregoing is true and correct to the best of my knowing.

X   Brant Daniel
#J-85968   Aug 10, 202?

②

1  Ronald Yandell / V-27927

2  CSP / SAC

3  P.O. Box 290066

4  Represa, Ca. 95671

5

6          IN THE United States District Court

7      For the Eastern District of California

8

9  Ronald Yandell                )        Case No.

10        Plaintiff              )

11      vs.                       )        Proof of Service

12  1) DEA Agent Brian Nehring    )

13  2) #0 Cory Perryman           )

14        Defendants             )

15

16      I, the undersigned, hereby certify that I am

17  over 21 years of age and on August 14, 2024 I

18  served a copy of First Complaint, by placing

19  it in a postage paid envelope addressed to

20  the :        United States District Court

21                Eastern District of California

22                501 1st, Ste 4-200

23                Sacramento, Ca.

24                95814 - 2322

25

26  I declare under penalty of perjury that the

27  foregoing is true and correct.

28                                    Ronald Yandell

1 | Ronald Yandell /V-27927
2 | CSP / SAC
3 | P.O. Box 290066
4 | Represa, CA. 95671
5 |
6 | IN THE United States District Court
7 | Eastern District of California
8 | Ronald Yandell
9 | PLAINTIFF         CASE NO. 2:21-CV-00469-DAD-AC
10 | VS.
11 | Donald Washington et al.,    PROOF OF SERVICE
12 | DeFendants
13 |
14 | I, THE UNDERSIGNED, Hereby certify that I Am
15 | over 21 years of Age and on April 14th, 2024, I
16 | served a copy of Notice of Submission; Summons,
17 | 3 completed USM-285 forms and 4 Thied Amended
18 | Complaints, by placing in a postage paid envelope
19 | addeessed to the United States District Court
20 | Eastern District of California
21 | 501 1st, STE 4-200
22 | Sacramento, CA.
23 | 95814-2522
24 |
25 | I declare under penalty of perjury that the
26 | Foregoing is true and correct.
27 | Ronald Yandell
28 | Signed